UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| KEDRIC MITCHELL,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, and POSTMASTER GENERAL OF THE UNITED STATES,<br><br>    Defendants. | Case No. 14-13916<br>Honorable Laurie J. Michelson<br>Magistrate Judge Mona K. Majzoub |

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [46]**

After a leave of absence due to his mental health, Plaintiff Kedric Mitchell sought to return to work at the United States Postal Service ("USPS"). He provided his supervisor with a letter from his psychologist which stated that he was able to return to work. But around the same time, Mitchell also sent the USPS a letter written by his wife that raised concerns about Mitchell's mental fitness to return to work. It noted that Mitchell may suffer a mental or physical breakdown should he return.

As a result, Mitchell was told that he could not return to work until his doctor responded to his wife's letter. The USPS did not receive a direct response and Mitchell was eventually terminated because of his lengthy absence from work. Mitchell then sued claiming that USPS's refusal to allow him to return to work was unlawful discrimination based on his mental illness and retaliation based on a prior Equal Employment Opportunity ("EEO") complaint.

Before the Court is Defendants' Motion for Summary Judgment. (R. 46.) Defendants say that Mitchell fails to establish a prima facie case because he cannot demonstrate that he is disabled

and that the employment action was taken because of his disability. They also argue that, even if he were able to establish a prima facie case, he cannot show that Defendants' nondiscriminatory reason for taking the employment action was pretext. The Court largely agrees. Thus, Defendants' Motion for Summary Judgment is GRANTED.

**I.**

In 1997, Plaintiff Kedric Mitchell began working for USPS. (R. 48-3, PID 590.) In February 2009, Mitchell filed his first EEO complaint alleging discriminatory treatment because of his depression. (R. 46-16, PID 490–503.) Later in 2009, Mitchell's depression led him to take a leave of absence. (R. 46-14, PID 455.)

On June 27, 2010, during Mitchell's leave of absence, Mitchell's wife, Roslyn Brown, sent a letter to Vice President of the Great Lakes Area Operations, Jo Ann Feindt ("Brown's letter"). (R. 46-4, PID 398–99). The letter explained Mitchell's mental instability and that they would be going public if the EEOC dispute was not resolved. (*Id.*) It was returned, marked "return to sender." (R. 46-2, PID 316.)

Around July 28, 2010, Mitchell attempted to return to work. He was told, however, that he had to get medical clearance before he was permitted to return. (R. 46-2, PID 301–302.)

So on August 2, 2010, Mitchell saw his psychologist, Dr. Amy Trabitz. (R. 46-2, PID 305.) That day, Dr. Trabitz wrote a note simply stating that Mitchell was "able to fully return to work with no restrictions." (R. 46-3, PID 397.) The next day, Mitchell again attempted to return to work. (R. 46-2, PID 306.) Mitchell provided his supervisor, Karl Sturdivant, with Dr. Trabitz's August 2, 2010 note. (R. 46-2, PID 294, 306.)

2

But, around that same time, Mitchell re-sent Brown's letter because it was previously marked "return to sender." (R. 46-2, PID 316.) Given its importance to the case, several sections of Brown's letter are reproduced here:

> Whether the Postal service believes it or not, my husband suffers from Stress and Depression. My husband has been off work since September 2009 and is preparing to return to work soon. With the help of his doctors my husband has been making great progress, and that is why his doctors will be clearing him to return to work. *But his doctors are not fully aware of the recent developments in his case, and how they may be affecting my husband's condition*.
>
> He feels he's ready to go back to work, and *I don't think he should return to work at this time. Nonetheless when he sees his doctors next week they will probably clear him to return to work. So he will go just because he trusts his doctors. But his doctors don't live with him, I do*.
>
> This is the third time my husband has had to take off work for his illness. Every time my husband has returned to work, he has been harassed and treated unfairly and forced to take off work again. Now he has an EEOC case pending, in order to determine if his allegations are true. *My fear is that my husband will suffer some type of Mental or Physical breakdown if he returns to work right now*, simply because your managers are not going to change how they do things for my husband's sake. I would appreciate it if you would use your authority to place him on administrative leave until his case is resolved. Because if the past is any kind of indication of what we can expect in the future, then my husband should not be allowed back to work until the truth is known.
>
> Please don't misunderstand me. My husband is not a trouble maker, but he does have a Mental Condition. A Mental Condition for which there is no cure for, *which makes him mentally unstable at all times. I hope I don't have to explain to you why you should not allow a mentally unstable individual to continue working in an environment he/she deems hostile*. It doesn't matter whether the environment is hostile or not. What matters is that the mentally unstable individual believes it to be hostile. My husband on several levels is in denial about his Mental Condition. Psychotherapy was not his idea, it was mine. I suggested it to him after doing extensive research on job related stress, once I seen he exhibited symptoms.
>
> I am not a doctor. I am just a concerned wife. I would try to convince my husband to abandon his case if I thought his case was invalid. But as it turns out my husband is telling the truth about the unfair treatment and harassment that is going on at the George W. Young facility where he works.
>
> Rest assured that this will be only time I will contact you Mrs. Feindt. So what you do with this letter is completely us to you. I am hoping that you do the right thing.

> But if you choose not to do what I have asked of you, then *you personally assume responsibility for anything that happens to my husband once he returns to work.*

(R. 46-4, PID 398–99.) (emphasis added).

On August 11, 2010, a USPS Threat Assessment Team ("TAT"), comprised of Gail Lewis, Lee Ward, and Dr. Nisha Parulika, met and discussed Brown's letter as well as the cover letter Mitchell wrote and sent with Brown's letter. (R. 48-2, PID 565–566.) The TAT was concerned that Ms. Brown "herself said that she felt that [Mitchell] should not be returned to work because of his mental state." (R. 48-2, PID 565.) The TAT therefore decided that, based on the letter, they needed "medical documentation to substantiate that [Mitchell] could return to work without causing harm to [him]self or others." (R. 48-2, PID 572.)

The same day, USPS officials met with Mitchell to discuss their concerns about Brown's letter. (R. 46-2, PID 290, 376.) They told Mitchell that, before he could return to work, he needed to have his doctor address Brown's letter in writing or he needed to sign a release permitting a USPS official to contact Dr. Trabitz directly. (R. 46-2, PID 290, 379.) Mitchell asked that this demand be put into writing, but his request was denied. (R. 46-2, PID 292.) Mitchell refused to sign the medical release and left work. (R. 46-2, PID 291–92; R. 46-7, PID 403.)

Mitchell asserts that Dr. Trabitz wrote three more letters, dated August 16, August 19, and August 27, 2010. (R. 48-11, PID 651–652). The August 16 letter stated, in full, that Mitchell had been treated for stress and depression from September 2009 to the present and that, in Dr. Trabitz's opinion, Mitchell was not a "danger to himself or to others." (R. 48-6, PID 638). The August 19 and August 27 letters likewise noted the periods of treatment and stated that Mitchell was able to perform his job without restrictions. (R. 48-6, PID 639–640). Mitchell says he mailed the August 16 and August 27 letters to Mr. Sturdivant, and that the August 19 letter "was presented to the

4

Defendant by my union." (R. 48-11, PID 651–652). Defendants deny receiving those letters. (R. 49, PID 657.)

Mitchell filed a second EEO complaint at the end of 2010. He asserted that Defendants' decision to reject his medical clearance and not allow him to return to work until his doctor addressed his wife's concerns was unlawful discrimination based on his disability of stress and depression. (R. 46-15, PID 482.) He also argued that this decision was unlawful retaliation for his first EEO complaint. (*Id*.)

In January 2011, Defendants sent Mitchell, who had been on leave since August 2010, a letter requesting medical documentation to substantiate his absence. (R. 46-6, PID 401–402.) Shortly after, Mitchell responded stating that he had not returned to work because USPS had rejected his medical clearance documents "because of a letter my wife sent" and he felt that USPS's demand for "documentation from [his] doctor that addressed the concerns in [his] wife's letter and specifically stated whether or not [he] posed a danger to [himself] or others" was unfair. (R. 46-7, PID 403.)

In May 2012, the EEOC entered judgment for USPS in Mitchell's second EEO complaint. (R. 46-8, PID 404.)

By June 2013 Mitchell had still not returned to work (from his August 2010 leave). USPS sent Mitchell a notice that he may be separated because of his long absence and scheduled an interview date for later that month. (R. 46-10, PID 429.) On August 12, 2013, Defendant sent a notice of separation. (R. 46-11, PID 430.)

After exhausting his administrative remedies with respect to his second EEO complaint, Mitchell filed the current action. (R. 1.)

**II.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here Mitchell. *See Matsushita*, 475 U.S. at 587.

**III.**

Mitchell brought his discrimination and retaliation claims under the Rehabilitation Act, which constitutes the "exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). The Court will therefore evaluate the claims solely under the Rehabilitation Act.[1]

---

[1] The Court will do so even though it appears that both Mitchell and Defendants assume in the summary judgment briefing that both the ADA and Rehabilitation Act were pled. (R. 46, PID 267; R. 48, PID 550.)

6

The standards used to determine whether there has been employment discrimination under the Rehabilitation Act "shall be the standards applied under [T]itle I of the Americans with Disability Act." 29 U.S.C. § 794(d). "Cases construing one statute are therefore instructive in construing the other." *Spence v. Donahue*, 515 F. App'x 561, 568 (6th Cir. 2013) (citing *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997).

### A.

Mitchell contends that he has provided direct evidence of discrimination. (R. 48, PID 555.) Direct evidence of discrimination is evidence that "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citation omitted). Aside from *saying* that he has provided direct evidence of discrimination, Mitchell does not point to any evidence that *requires* the conclusion that unlawful discrimination was a motivating factor. The Court will therefore analyze Mitchell's claim based upon indirect evidence of discrimination.

In assessing a Rehabilitation Act claim based on indirect evidence of discrimination, the Court applies the familiar *McDonnell Douglas* burden-shifting framework. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Once a plaintiff makes out a prima facie case, the burden shifts to the defendants to provide a non-discriminatory explanation for the employment action. *Id.* If the defendants do so, the burden shifts back to the plaintiff to prove that the defendants' explanation is pretext for unlawful discrimination. *Id.*

### 1.

To establish a prima facie case of disability discrimination claim under the Rehabilitation Act, Mitchell must show: (1) he is an individual with a disability, (2) he is otherwise qualified to perform the job requirements, with or without reasonable accommodation, and (3) he suffered an

adverse employment action solely by reason of his disability. *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 250 (6th Cir. 2011). On this record, the Court has doubts that Mitchell has cleared this hurdle.[2]

For one, Mitchell's own arguments seem to defeat such a claim. He argues that USPS's actions were taken *both* because of his disability and in retaliation for his 2009 EEO complaint. As the Rehabilitation Act standard requires that the employment action be taken "solely because of" the disability, he cannot assert that something other than his disability, such as the 2009 EEO complaint, was the reason for the employment decision.

Second, the Government makes a strong case that Mitchell has not established a "disability" under the ADA, and therefore the Rehabilitation Act. 29 U.S.C. § 794(d); 42 U.S.C. § 12102. Mitchell argues that "it is undisputed" that he has an impairment "that substantially limits one or more of his major life activities." (R. 48, PID 551.) As supporting evidence, Mitchell cites to his deposition where he states that his depression causes his cholesterol and sugar levels to rise. (R. 48-3, PID 609.) He also refers to Dr. Trabitz's deposition, where she stated that Mitchell engages in self-destructive behaviors like "not taking care of himself, not eating properly, not exercising, [and] not sleeping enough." (R. 48-5, PID 629.) Mitchell has not, however, connected these health concerns to an impairment of a major life activity, or provided evidence that any impairments rose to the level of a substantial limitation. See 42 U.S.C. § 12102(1).

---

[2] The EEOC analyzed Mitchell's complaint as alleging an unlawful request for a medical examination pursuant to 29 CFR §§1630.13(b), 1630.14(c). But the little briefing Mitchell has done on his claims, however, does not suggest that is his grievance. In Mitchell's Response, where he argues that he was not a risk and was therefore qualified to perform his job, he recites law setting the standard for making a medical request. After this recitation, however, he concludes "[i]n the case at bar, Defendant never requested that the Plaintiff submit to a medical exam. Rather, Plaintiff was allegedly terminated in part for failing to have a letter written by his wife psychoanalyzed by his doctor." (R. 48, PID 554–555.) The Response evaluates his claims under *McDonnell Douglas*. The Court will therefore not raise a claim that Mitchell did not.

Despite that Mitchell may not have met two elements, the Court will assume, without deciding, that Mitchell has established a prima facie case and will proceed to the next stages. *See Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998). However, for purposes of the pretext analysis, the Court will, of course, still consider Mitchell's evidence for making out a prima facie case. *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) ("[O]n summary judgment, [i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." (internal quotation marks and citations omitted, second alteration in original)).

**2.**

Meeting the burden of stating a legitimate, nondiscriminatory basis for the action is "merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Sjostrand v. Ohio State University*, 750 F.3d 596, 600 (6th Cir. 2014) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009)).

As a nondiscriminatory reason for placing Mitchell on leave, USPS asserts that it was concerned about his personal safety if he returned to work. (R. 46-2, PID 331, 335.) This concern, says USPS, stemmed from Brown's letter. (R. 46-2, PID 333.) Brown advised that Mitchell had a mental condition, that he was at times unstable, that she was concerned that he would suffer a physical or mental breakdown should he return to work, that Mitchell's doctors were not aware of aspects of his condition, and that USPS should not allow an unstable employee back into a workplace that he considered hostile. (R. 46-4, PID 398–399.) Further, Mitchell himself sent the letter, which gave USPS additional reason for concern. (R. 48-2, PID 566.)

While not raised by Mitchell, the Court should acknowledge the possible relationship between USPS's safety concern and Mitchell's claimed mental disability of depression. Indeed, USPS officials mentioned Mitchell's "mental condition" in discussing their concern about his safety if he returned to work. (R. 48-3, PID 570.) This does not, however, render the asserted basis of their action discriminatory. Under 2008 E.E.O.C. Guidance to the ADA, an employer can take an adverse action against a disabled individual for disability-related conduct if the conduct is job-related or concerns a business necessity. *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729 (6th Cir. 2016). Whether an employee poses a threat to himself or others is related to the job or even a business necessity. *See Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014). True, USPS's concern does not stem from Mitchell's past conduct, but from possible future conduct. But this does not alter the analysis in the case because a warning letter from Mitchell's wife gave USPS a legitimate basis for believing that Mitchell could be a risk to himself or others in the future. Further, it is not clear that the instability and safety concern *is* a manifestation of his disability, the way the erratic conduct in *Yarberry* was a clear manifestation of the plaintiff's bipolar disorder. Defendants have therefore carried their burden of articulating a legitimate, nondiscriminatory basis for their actions. The burden thus shifts back to Mitchell to show that USPS's safety concern was really just pretext for discrimination.

**3.**

"A plaintiff may show pretext by demonstrating: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the adverse employment action, or (3) that they were insufficient to motivate the adverse employment action.'" *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013) (alterations in original) (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)). In examining pretext under the

Rehabilitation Act, unlike in other employment-discrimination contexts, the plaintiff must show that discrimination was the sole cause of the action, not just one of the causes. *Rumburg v. Secretary of the Army*, 2011 WL 1595067 (E.D. Mich. April 11, 2011) (citing *Jones*, 488 F.3d at 409–410)).

Mitchell does not specify which theory of pretext he is pursuing. (R. 48, PID 557–558.) But "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). In other words, "at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id*. In the summary judgment context, this requires Mitchell to "produce[ ] evidence from which a jury could reasonably doubt the employer's explanation." *Id*. The evidence of discrimination that Mitchell relies on does not satisfy this burden.

Mitchell first seems to assert that he was treated differently. (R. 48, PID 557.) He does not, however, explain how any other similarly situated employee was treated. Mitchell's conclusory claim of disparate treatment does not establish pretext.

Second, Mitchell seems to claim that USPS's concern over workplace safety was not the true motivation for its actions because Mitchell provided USPS with medical records and several letters from his doctor which stated he was not a threat. (*Id*.)

The parties dispute which of Dr. Trabitz's notes USPS received. (R. 49, PID 657; R. 48-11, PID 651–652.) Defendants only attached one, dated August 2, 2010, to their Motion for Summary Judgment. That note states that Mitchell is "fully able to return to work with no restrictions." (R. 46-3, PID 397.) But Mitchell says he provided all of Dr. Trabitz's notes to USPS, including the one where she states that Mitchell was not a danger to himself or others.

11

But even if a reasonable jury were to find that USPS received all of Dr. Trabitz's notes, it could still not reach the conclusion that USPS's request for a direct response to Brown's letter was a pretext for discrimination. The record reflects that because of specific content in Brown's letter, USPS in fact believed that Mitchell would be a danger to himself or others if he returned to work. (R. 46-2, PID 333.) In particular, upon receipt of Brown's letter, the USPS TAT met and expressed concern about Mitchell being dangerous to himself. (R. 48-2, PID 566.) Soon after that meeting, USPS met with Mitchell and specifically raised Brown's letter. (*Id.*) And because that letter explicitly stated that Mitchell's doctors were unaware of how bad his condition was, USPS told Mitchell they wanted his doctor to directly respond to his wife's concerns. (R. 46-2, PID 374.) Yet none of Dr. Trabitz's letters mention or address Brown's letter. They simply provide a perfunctory statement that Mitchell is able to return to work without restrictions. (R. 48-6, PID 638–640.) They give no indication that Dr. Trabitz was aware of or even considered Brown's concerns, let alone any explanation for discounting or rejecting them. So even if USPS received all of Dr. Trabitz's letters, they did not provide the information that USPS expressly asked for and do not demonstrate that USPS no longer sincerely believed that Mitchell was a potential danger.

Mitchell's best argument is that one of Dr. Trabitz's notes states that she did not believe that Mitchell was a "danger to himself or others at this time" (R. 48-6, PID 638), and that Dr. Trabitz testified that she had read Brown's letter and still did not find him to be a threat. (R. 48, PID 547.) But Mitchell takes this testimony out of context. Dr. Trabitz stated earlier in her deposition that she never saw Brown's letter prior to writing the letters that Mitchell provided to USPS. (R. 48-5, PID 627, 633.)

While Mitchell may question USPS's decision to elevate Brown's letter above Dr. Trabitz's letters in determining whether he was a safety threat, the Court's analysis is not whether

12

Defendants' decision was wise or correct, but rather whether it was discriminatory. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) ("[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'") (quoting *Chen*, 580 F.3d at 400 (6th Cir. 2009)). And Mitchell has not "produced evidence from which a jury could reasonably doubt" Defendants' explanation that it was sincerely motivated by safety concerns. *See Chen*, 580 F.3d at 400 n.4 (6th Cir. 2009). Defendants are therefore entitled to summary judgment on Mitchell's claim of disability discrimination.

**B.**

Mitchell's second claim is that requiring the extra documentation before he was allowed to return to work, which eventually led to his termination, was retaliation based on his first EEOC claim.

"A prima facie case of retaliation has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

Mitchell fails to show causation. Indeed, Mitchell does not even address his retaliation claim in his Response to Defendants' Motion for Summary Judgment. (R. 48.) The Court is aware, though, that during his deposition, Mitchell testified that he believed USPS retaliated against him based on his first EEO complaint. (R. 46-14, PID 467.) Speculation of this sort "does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *See Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995)

13

(emphasis in original) (cited with approval in *Cobb v. Keystone Memphis, LLC*, 526 F.App'x. 623, 630 (6th Cir. 2013)). Defendants are therefore entitled to summary judgment on Mitchell's retaliation claim.

## C.

In responding to USPS's motion, Mitchell appears to argue that he raised a claim for failure to provide a reasonable accommodation based upon USPS's refusal to put its request for Mitchell's doctor to respond to Brown's letter in writing. (R. 48, PID 545–546.)

This claim is not exhausted. Mitchell's 2010 EEO complaint does not mention a failure to accommodate. (R. 14-2, PID 50–52). Further, in his 2011 EEO Investigative Affidavit, Mitchell responds that "the only reasonable accommodation I have asked for is to be treated fairly and with respect, but this request has yet to be honored." (R. 46-15, PID 481.) Indeed, the EEOC decision did not mention or respond to a reasonable accommodation claim. (R. 46-8.)

Even if the Court were to consider this claim, Mitchell has failed to create a material fact issue that the accommodation was needed, "i.e., a causal relationship existed between the disability and the request for accommodation." *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997). He relies only on his own deposition testimony that, based on his depression, he asked for an accommodation that the request be put in writing. (R. 4803, PID 606.) He provides no support that such an accommodation was necessary for and somehow related to his depression. In fact, his own statements undercut this connection. (R. 48-3, PID 607 ("Q: If they had made the same request of someone who wasn't diagnosed with depression, would that have been discriminatory? A: If they refused to put their request in writing, yes, it would be.").) The Court therefore finds that, as a matter of law, Mitchell has not made out a reasonable accommodation claim.

**IV.**

For the reasons stated, the Court GRANTS Defendants' Motion for Summary Judgment.

                                                    s/Laurie J. Michelson  
                                                    LAURIE J. MICHELSON  
Dated: October 4, 2017                    U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 4, 2017.

                                                    s/Keisha Jackson  
                                                    Case Manager